# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

JOSE TURCIOS, D.D.S,

      Plaintiff,

      v.                                    Case No.: 4:17-CV-773 SWW

TABITHA CARTER, individually,
BRANDON EGGERTH, individually,
JARED MCCAULEY, individually,
BRIAN DUNGER, individually,
MICHAEL LUNDY, individually,
ANDREA M. CARTER, individually,         ***_JURY TRIAL DEMANDED_
DECEMBER SMITH and
SARA MELTON,

      Defendants.

## AMENDED COMPLAINT

NOW COMES Plaintiff, JOSE TURCIOS, D.D.S., by and through his attorneys, LAUX

LAW GROUP, and for his cause of action, states as follows:

## JURISDICTION AND VENUE

1.     This action arises under the United States Constitution, particularly under the

Fourth and Fourteenth Amendments, and under law, particularly the Civil Rights Act of 1871

and 42 U.S.C. § 1983.  This Honorable Court has jurisdiction by virtue of 28 U.S.C. §§ 1331 and

1367.  Venue is founded in this Court upon 28 U.S.C. § 1391 as the acts of which Plaintiff

complains arose in this District.

## PARTIES

2.     At all relevant times, Plaintiff, JOSE TURCIOS, D.D.S., ("DR. TURCIOS") was

and is a citizen of the United States of America, and he is, therefore, entitled to all legal and

constitutional rights afforded citizens of the United States of America.  In 2009, DR. TURCIOS

opened Healthy Smiles, a general dentistry office, located at 215 N. Bowman Road, Little Rock, Arkansas, where he has practiced as a licensed dentist.

3.      In March 2015, and at all relevant times, TABITHA CARTER[1] (hereafter "T. CARTER") was employed by the City of Little Rock ("City") as a Little Rock Police Department ("LRPD") police officer and was acting under the color of state law, within the scope of her employment,.  Prior to March 2015, and at all relevant times, T. CARTER was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and proper felony investigation protocol.

4.      In December 2009, T. CARTER became a detective with the LRPD's Juvenile Unit.  As a detective with the LRPD's Juvenile Unit, and at all relevant times, T. CARTER was ostensibly trained in the protocol for proper investigations of offenses committed against juveniles, and was required to possess a working knowledge of the Arkansas Code, particularly Title 9 (Family Law), Subtitle 3 (Minors).

5.      In March 2015, and at all relevant times, BRANDON EGGERTH (hereafter "EGGERTH") was employed by the City as a LRPD police officer and was acting under the color of state law, within the scope of his employment.  Prior to March 2015, and at all relevant times, EGGERTH was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and proper felony investigation protocol.

6.      In March 2015, and at all relevant times, JARED MCCAULEY (hereafter "MCCAULEY") was employed by the City as a LRPD police officer and was acting under the

---

[1] In March 2015, Tabitha Carter was legally known as Tabitha McCrillis.  As alleged in Plaintiff's Paragraph No. 75, at some point after March 2015, Tabitha McCrillis legally changed her name to Tabitha Carter.  Regardless of the status of her legal name at any given time, Plaintiff herein refers to this separate defendant as Tabitha Carter.

color of state law, within the scope of his employment.  Prior to March 2015, and at all relevant times, MCCAULEY was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and proper felony investigation protocol.

7.     In March 2015, and at all relevant times, BRIAN DUNGER (hereafter "DUNGER") was employed by the City as a police officer and was acting under the color of state law, within the scope of his employment.  Prior to March 2015, and at all relevant times, DUNGER was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and proper investigation protocol.

8.     In March 2015, and at all relevant times, MICHAEL LUNDY (hereafter "LUNDY") was employed by the City as a LRPD police officer and was acting under the color of state law, within the scope of his employment.  Prior to March 2015, and at all relevant times, LUNDY was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and proper investigation protocol.

9.     In March 2015, LUNDY was married to Dr. Liza Lundy (hereafter "Dr. Lundy"), a general dentist.  Prior to March 2015, Dr. Lundy had worked for DR. TURCIOS at Healthy Smiles.  In 2013, Dr. Lundy left her employment at Healthy Smiles, and opened her own general dentistry office.  By March 2015, Dr. Lundy was a business competitor of DR. TURCIOS, her former boss.

10.     In March 2015, and at all relevant times, ANDREA M. CARTER (hereafter "A. CARTER") was employed by the State of Arkansas as an investigator with the Arkansas State

Police ("ASP") Crimes Against Children Division ("CACD") and was acting under the color of state law, within the scope of her employment.  Prior to March 2015, and at all relevant times, A. CARTER was ostensibly trained in police matters, including, but not limited to, the Fourth and Fourteenth Amendments of the United States Constitution, the legal concept of probable cause and the proper investigation protocol pertaining to allegations of sexual abuse made by a juvenile.

11.     In March 2015, and all relevant times, A. CARTER was ostensibly trained as a CACD investigator and also ostensibly trained in the proper investigation of complaints of sexual abuse committed upon juveniles.  In March 2015, and at all relevant times, A. CARTER was required to possess a working knowledge of the Arkansas Code, particularly Title 9 (Family Law), Subtitle 3 (Minors).

12.     Moreover, in March 2015, and at all relevant times, A. CARTER was required to follow all applicable provisions in the Arkansas Department of Human Services ("ADHS") Division of Children & Family Services ("DCFS") Policy & Procedure Manual.

13.     In March 2015, and at all relevant times, DECEMBER SMITH ("SMITH") was a citizen of Little Rock, and she owed a duty of reasonable care to the public at large, including DR. TURCIOS.

14.     In March 2015, and at all relevant times, SMITH owed a duty to the public at large, including DR. TURCIOS, to refrain from willfully making false accusations in an effort to aid the fraudulent filing of criminal charges against citizens.

15.     In March 2015, and at all relevant times, SARA MELTON ("MELTON") was a citizen of Little Rock, and she owed a duty of reasonable care to the public at large, including DR. TURCIOS.  MELTON is the mother of SMITH.

4

16.    At all relevant times, including March 2015, MELTON owed a duty to the public at large, including DR. TURCIOS, to refrain from willfully making false accusations in an effort to aid the fraudulent filing of criminal charges against citizens.

17.    In March 2015, and at all relevant times, the City was a municipality organized and existing under the laws of the State of Arkansas.  At all relevant times, the City was located in the County of Pulaski, State of Arkansas, and was the employer of T. CARTER, EGGERTH, MCCAULEY, DUNGER and LUNDY.  At all relevant times, the LRPD was a subdivision within the municipality which is the City.  At all relevant times, the City is and was empowered, funded and directed to pay any tort or § 1983 civil rights judgment for compensatory damages, actual damages, costs and attorney fees for which any City employee acting within the scope of his or her employment is found liable.  Accordingly, the City is an indemnification party regarding the acts and/or omissions committed by T. CARTER, EGGERTH, MCCAULEY, DUNGER and LUNDY, and each of them, of which DR. TURCIOS herein complains.

18.    At all relevant times, the City participated in the Arkansas Municipal Legal Defense Program ("AMLDP").  The acts and/or omissions of which DR. TURCIOS herein complains constitute tortious acts and unconstitutional conduct committed by T. CARTER, EGGERTH, MCCAULEY, DUNGER and LUNDY, and each of them.  Accordingly, the AMLDP is a primary or secondary indemnification party regarding the acts and/or omissions of T. CARTER, EGGERTH, MCCAULEY, DUNGER and LUNDY, and each of them, of which DR. TURCIOS herein complains.

19.    In March 2015, and at all relevant times, A. CARTER was employed by the State of Arkansas.

20.     At all relevant times, the State of Arkansas is and was empowered, self-funded and directed to pay any tort or § 1983 civil rights judgment for compensatory damages, actual damages, costs and attorney fees for which any State of Arkansas employee, such as A. CARTER, acting within the scope of her employment, is found liable.  Accordingly, the State of Arkansas is an indemnification party regarding the acts and/or omissions committed by A. CARTER of which DR. TURCIOS herein complains.

## FACTUAL ALLEGATIONS

21.     At all relevant times, DR. TURCIOS was a licensed dentist in the State of Arkansas.  DR. TURCIOS is of Latino-American heritage, having emigrated to the United States from El Salvador in 2004 after first earning his Doctor of Dental Surgery degree.  From 2009 to the present, DR. TURCIOS has owned and operated Healthy Smiles in Little Rock.  Prior to March 2015, DR. TURCIOS' dental license had never been suspended, and he had never been disciplined by the Arkansas State Board of Dental Examiners (hereafter "Dental Board") or restricted from practicing dentistry in any way.

22.     In 2010, DR. TURCIOS began treating SMITH, providing her both restorative and orthodontic care.  With the exception of a period where SMITH resided out of state, DR. TURCIOS treated her continuously until March 2015.  From 2010 through February 2015, there were no complaints made to DR. TURCIOS or his staff by SMITH, her mother, MELTON, or her grandmother, Myrtle Clifton ("Ms. Clifton"), regarding the dental treatment provided to SMITH by DR. TURCIOS or any issues of any kind involving SMITH's care.

23.     On March 4, 2015, DR. TURCIOS provided restorative and orthodontic treatment to SMITH at Healthy Smiles.  Two (2) dental assistants assisted with SMITH's March 4

treatment: Anita Henderson (hereafter "Ms. Henderson"); and Alyssa Smith (hereafter "Ms. Smith")(no relation to SMITH).

24.     As part of her restorative treatment, SMITH was placed under nitrous oxide.  The restorative treatment provided to SMITH was successful.  Once SMITH's restorative treatment was complete, DR. TURCIOS and Ms. Henderson administered oxygen to flush out the nitrous oxide.  After approximately five (5) minutes, SMITH was alert and prepared to proceed with the orthodontic treatment.  Ms. Smith performed SMITH's orthodontic treatment.  After Ms. Smith completed the orthodontic treatment, SMITH left Healthy Smiles.

25.     DR. TURCIOS was alone with SMITH on five (5) occasions during SMITH's appointment:

    a)  For ten (10) seconds starting at approximately 9:08:32;

    b)  For one (1) minute and twenty-eight (28) seconds at approximately 9:09:22;

    c)  For fifty-four (54) seconds at approximately 9:11:35;

    d)  For twenty-six (26) seconds at approximately 9:48:54; and

    e)  For nineteen (19) seconds at approximately 9:50:39.

26.     On March 4, 2015, after SMITH's appointment with DR. TURCIOS, MELTON contacted the LRPD, and spoke with T. CARTER.  At that time, MELTON told T. CARTER that SMITH had been sexually assaulted by DR. TURCIOS during her March 4 appointment.

27.     SMITH's allegation that she was sexually assaulted by DR. TURCIOS on March 4, 2015 was false.

28.     On March 4, 2015, SMITH told T. CARTER that she had been "given a small amount of gas," meaning nitrous oxide.        __WHO TOLD TM THIS?  CLIFTON?

29.     In March 2015, T. CARTER was a defendant in a civil rights case styled *Ellison v. Lesher et al.*, 4:11-CV-752 BSM, which generated local and national news media attention.

30.     In March 2015, T. CARTER and A. CARTER were engaged in a romantic relationship.

31.     At some point between March 4 and March 9, 2015, T. CARTER informed LUNDY that she was investigating DR. TURCIOS for the alleged March 4 sexual assault. Around that time, LUNDY informed T. CARTER that his wife had previously worked for DR. TURCIOS.  LUNDY also identified several of DR. TURCIOS' former employees, including his wife, Dr. Lundy, each of whom he reported would provide T. CARTER with information she could use to criminally charge DR. TURCIOS.

32.     At some point between March 4 and March 9, 2015, T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY and/or A. CARTER communicated with SMITH and/or MELTON, and significantly encouraged SMITH and/or MELTON to fabricate false allegations against DR. TURCIOS, to omit material facts from SMITH's March 4 visit, and to further assist in the malicious prosecution of DR. TURCIOS.

33.     Alternately, at some point between March 4 and March 9, 2015, T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY and/or A. CARTER communicated with SMITH and/or MELTON wherein T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY and/or A. CARTER insinuated themselves, and each of them, into a position of interdependence with SMITH and/or MELTON, so that SMITH and/or MELTON were joint participants in the enterprise which was the malicious prosecution of DR. TURCIOS.

34.     On March 9, 2015, after speaking with LUNDY, T. CARTER referred the matter of SMITH's allegations of sexual abuse against DR. TURCIOS to ADHS, which accepted the

matter for investigation and opened ADHS Case No. 20151917, *In the Matter of Jose Turcios vs. Arkansas State Police Crimes Against Children Division*.

35.     On March 11, 2015, T. CARTER, with A. CARTER present, interviewed SMITH at the Children's Protection Center.  SMITH's interview was video and audio recorded.

36.     During the March 11 interview, SMITH told T. CARTER that SMITH had previously been to an advocacy center.  Neither T. CARTER nor A. CARTER asked SMITH why she had previously been to an advocacy center or explored the topic with SMITH.

37.     During the March 11 interview, SMITH told T. CARTER that her mother, MELTON, had been in a situation similar to the one SMITH alleged occurred to her.  Neither T. CARTER nor A. CARTER asked SMITH what she meant by that statement or explored the topic with SMITH.

38.     During the March 11 interview, SMITH told T. CARTER that MELTON claimed to have been sexually assaulted previously.  Neither T. CARTER nor A. CARTER asked SMITH to explain the details of her statement or explored the topic with SMITH.

39.     Despite the fact that A. CARTER was present during T. CARTER's March 11 interview of SMITH at the Child Protection Center, no mention is made of A. CARTER's presence in the LRPD-generated transcript of the interview.

40.     SMITH's interview was approximately twenty-four (24) minutes in length.

41.     On March 11, 2015, after T. CARTER's interview of SMITH, T. CARTER and A. CARTER interviewed MELTON, with EGGERTH and MCCAULEY present.  MELTON's interview was approximately nine (9) minutes in length.

42.     During MELTON's March 11 interview, neither T. CARTER nor A. CARTER asked MELTON about why SMITH had previously been to an advocacy center.   During

MELTON's March 11 interview, neither T. CARTER nor A. CARTER asked MELTON about her prior allegation of sexual abuse, as reported to them by SMITH.

43.     On March 11, 2015, T. CARTER spoke with MELTON and asked MELTON to obtain SMITH's dental records.  SMITH informed T. CARTER that it would take up to twenty-four (24) hours before SMITH's dental records could be obtained by MELTON.

44.     On March 11, 2015, at some point after the interview of MELTON, T. CARTER and A. CARTER interviewed Valerie Robertson ("Ms. Robertson").  Ms. Robertson's interview was eighteen (18) minutes in length.

45.     On March 12, 2015, T. CARTER interviewed Myrtle Clifton via telephone, and the interview was audio recorded.  Ms. Clifton's interview was approximately nine (9) minutes in length.

46.     Ms. Clifton told T. CARTER that SMITH told her that DR. TURCIOS had given her "lots and lots of gas."

47.     On the afternoon of March 12, 2015, after her interview of Ms. Clifton, T. CARTER presented her Affidavit for Warrant of Arrest to Judge Alice Lightle (hereafter "Judge Lightle") of the Pulaski County Circuit Court.  In her affidavit, T. CARTER swore to her belief that probable cause existed for the arrest of DR. TURCIOS for Second Degree Sexual Assault. In her affidavit, T. CARTER provided the bases for her determination that probable cause existed for the arrest of DR. TURCIOS, and those bases were as follows: "the statements of December Smith, Sara Melton, Valerie Robertson and Myrtle Clifton."

48.     T. CARTER did not obtain SMITH's dental records prior to petitioning the court for an arrest warrant for DR. TURCIOS.

49.     T. CARTER did not obtain any video recordings from Healthy Smiles prior to petitioning the court for an arrest warrant for DR. TURCIOS.

50.     In her affidavit, T. CARTER represented to Judge Lightle that SMITH had stated that DR. TURCIOS had given SMITH "lots of [nitrous] gas."

51.     In her affidavit, T. CARTER described portions of Ms. Clifton's interview but did not include in the affidavit Ms. Clifton's statement that SMITH told her that DR. TURCIOS gave her "lots and lots of gas."

52.     As a direct result of T. CARTER's affidavit, Judge Lightle authorized the issuance of the warrant for the arrest of DR. TURCIOS.

53.     On March 12, 2015, at approximately 4:00 pm, T. CARTER, EGGERTH and DUNGER arrested DR. TURCIOS for Second Degree Sexual Assault while DR. TURCIOS was in the presence of his minor son, at the Little Rock Athletic Club, where he was a member.

54.     On March 12, 2015, during the arrest of DR. TURCIOS, neither T. CARTER, EGGERTH nor DUNGER had an activated or operational MVR system, body camera or body microphone.

55.     There are no video or audio recordings of the arrest of DR. TURCIOS in the possession of the City, LRPD, T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY, A. CARTER, ASP, CADC or DFHS.

56.     On March 12, 2015, DR. TURCIOS was handcuffed, placed in a LRPD squad car and transported to LRPD headquarters for questioning.  On March 12, 2015, DR. TURCIOS waived his *Miranda* rights, and T. CARTER and MCCAULEY interviewed him, with the interview audio recorded.  During his interview, DR. TURCIOS denied sexually assaulting SMITH.

57.     The March 12, 2015 arrest of DR. TURCIOS was reported to the public by the Little Rock local media, including KARK-NBC and the Arkansas Democrat-Gazette.

58.     On March 13, 2015, at approximately 1:00 pm, T. CARTER, EGGERTH and A. CARTER served a search warrant on the premises of Healthy Smiles.

59.     On March 13, 2015, during the course of the warrant service, T. CARTER seized SMITH's dental records, video recordings of the interior of Healthy Smiles from March 4 and electronic storage items.   During the course of the March 13 warrant service, T. CARTER viewed the treatment area where SMITH claimed she was sexually assaulted, and LRPD's Crime Scene Specialist Unit ("CSSU") took photographs of the interior of Healthy Smiles.

60.     As reflected in T. CARTER's March 26, 2015 memo entitled "Information Sheet," she and A. CARTER watched video footage from Healthy Smiles together and over the course of several days.

61.     On March 13, 2015, the Dental Board called an emergency meeting regarding DR. TURCIOS' arrest, and for the purpose of determining whether it should suspend his dental license.   On that date, the Dental Board voted to issue an emergency order of suspension against DR. TURCIOS based on his arrest.

62.     On March 17, 2015, the Dental Board suspended DR. TURCIOS' dental license based on his arrest by T. CARTER and the criminal charges T. CARTER brought against him.

63.     On April 14, 2015, DR. TURCIOS' suspension was lifted, but not before he was barred from practicing dentistry from approximately March 17, 2015 to April 14, 2015, a period of approximately twenty-eight (28) days.   After his suspension was lifted, DR. TURCIOS was forced to never be alone with any patients as a condition, a measure which caused him personal humiliation.

12

64.     In December 2015, Rev. Tim Reed of the Covenant Presbyterian Church called the CACD Child Abuse Hotline and reported allegations of sexual abuse committed by a physician named Dr. James Nesmith ("Dr. Nesmith"), who is a white male.

65.     On January 8, 2016, the Prosecuting Attorney's Office charged DR. TURCIOS with Second Degree Sexual Assault, based on the criminal investigation initiated and conducted by T. CARTER.

66.     On January 21, 2016, March 7, 2016, March 28, 2016, April 11, 2016, and April 25, 2016, DR. TURCIOS took time from his dental practice and attended plea and pretrial hearings in the matter of *State of Arkansas v. Jose E. Turcios*, Pulaski County Circuit Court Case No. 60-CR-16-86.

67.     Reflecting the conspiratorial agreements reached in early March 2015, on February 29, 2016, MELTON filed a civil lawsuit on behalf of SMITH against DR. TURCIOS in the Pulaski County Circuit Court, demanding monetary damages from him.

68.     In late April 2016, the criminal trial in the matter of *State of Arkansas v. Jose E. Turcios*, Pulaski County Circuit Court Case No. 60-CR-16-86, proceeded.

69.     During DR. TURCIOS' criminal trial, T. CARTER testified that she was specially trained on interviewing juveniles

70.     During DR. TURCIOS' criminal trial, T. CARTER testified that she never determined exactly when SMITH specifically was on or off nitrous oxide during the criminal investigation.

71.     During DR. TURCIOS' criminal trial, T. CARTER testified that all of the treatment rooms at Healthy Smiles have openings on two (2) sides, and she agreed that, based on

the video footage from Healthy Smiles, there were "people walking all over the place" in the building while DR. TURCIOS provided treatment to SMITH.

72.     During DR. TURCIOS' criminal trial, T. CARTER admitted that she never determined how many times someone walked by the treatment room where DR. TURCIOS provided treatment to SMITH.

73.     On April 26, 2016, the jury impaneled in *State of Arkansas v. Jose E. Turcios*, Pulaski County Circuit Court Case No. 60-CR-16-86 acquitted DR. TURCIOS of all criminal charges.

74.     Defendants, and each of them, fabricated evidence, withheld material facts that showed that there was no probable cause to arrest DR. TURCIOS or charge him with Second Degree Sexual Assault, and, further, misrepresented material facts in order to falsely incriminate DR. TURCIOS.

75.     At some point after T. CARTER's arrest of DR. TURCIOS, but before she testified under oath in open court against him on April 28, 2016, T. CARTER and A. CARTER married each other or otherwise entered into a state-recognized domestic partnership.

76.     In October 2017, LRPD Public Information Officer, Lt. Michael Ford stated to the media that Dr. Nesmith's victims made complaints of sexual assault through DHS over a time period from 2000 to 2015.

77.     Dr. Nesmith was not arrested on criminal charges for sexual assault by LRPD in December 2015.  Dr. Nesmith was not arrested on criminal charges for sexual assault by LRPD in 2016.

78.     In October 2017, Dr. James Nesmith was charged with Second Degree Sexual Assault.

79.     In October 2017, Dr. Nesmith turned himself in to the LRPD in regard to the sexual assault allegations.

**COUNT I**
**ALL DEFENDANTS**
**MALICIOUS PROSECUTION**

80.     Plaintiff hereby incorporates and re-alleges Paragraphs one (1) through seventy-nine (79) as though fully alleged in Count I.

81.     All criminal proceedings arising out of the charges brought against DR. TURCIOS, namely, the matter of *State of Arkansas v. Jose E. Turcios*, Pulaski County Circuit Court Case No. 60-CR-16-86, terminated in DR. TURCIOS' favor.

82.     Law enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect.  An officer contemplating an arrest is not free to disregard, conceal or withhold plainly exculpatory evidence, even if substantial inculpatory evidence standing by itself suggests that probable cause exists.  Probable cause does not exist where minimal further investigation would have exonerated the suspect.

83.     In March 2015 and at all relevant times, SMITH and MELTON were state actors, operating under color of law, insofar as T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY and A. CARTER coerced and significantly encouraged SMITH and MELTON to fabricate allegations against DR. TURCIOS.  Alternately, in March 2015, and at all relevant times, there existed a nexus and joint action between SMITH and MELTON on the one hand and T. CARTER, EGGERTH, MCCAULEY, DUNGER, LUNDY and A. CARTER on the other, which intertwined Defendants in a symbiotic relationship and made their collective actions against DR. TURCIOS an unconstitutional joint enterprise.

84.     At all relevant times, including March 2015 and April 2016, T. CARTER was lead LRPD investigator in regard to LRPD Incident No. 2015-23777.   At all relevant times, including March 2015 and April 2016, A. CARTER was the lead CACD investigator in Chris __ Referral No. 1732204.

85.     At all relevant times, including March 2015, Defendants, and each of them, knew it was objectively unreasonable and outrageous to fabricate false allegations of sexual assault against an individual.

86.     At all relevant times, including March 2015, T. CARTER knew that, when seeking to obtain an arrest warrant from a judge or magistrate, it was against proper police protocol to ignore plainly exculpatory evidence and to omit material exculpatory facts.

87.     At all relevant times, including March 2015, EGGERTH, MCCAULEY, DUNGER and LUNDY, and each of them, knew that it was against proper investigation protocol to ignore plainly exculpatory evidence and to omit material exculpatory facts while endeavoring, on behalf of the City, to build a criminal case against an individual alleged of abusing a child.

88.     At all relevant times, including March 2015, A. CARTER knew that it was against proper investigation protocol to ignore plainly exculpatory evidence and to omit material exculpatory facts while endeavoring, on behalf of the State of Arkansas, ASP and/or CACD, to build an administrative case of child maltreatment against an individual alleged of abusing a child.

89.     The arrest warrant authorized by Judge Lightle was obtained by evidence fabrication, willful omission of exculpatory information and deliberate misrepresentation of material facts committed by Defendants, and each of them.

90.     Despite lacking probable cause to arrest DR. TURCIOS, and with improper and sinister motives, Defendants pursued criminal charges against him, demonstrating a willful, wanton and conscious indifference to his constitutional rights and constitutionally-protected property interests, and showing something other than a desire to see the ends of justice served.

91.     Defendants' conduct proximately caused a deprivation of the rights, privileges and immunities secured to DR.TURCIOS by the Fourth and Fourteenth Amendments to the United States Constitution and laws enacted thereunder.  With this conduct, Defendants showed a reckless or callous indifference to DR. TURCIOS' federally-protected rights.

92.     Defendants' acts and/or omissions were done with the intent to damage DR. TURCIOS' professional reputation and interfere with his business relationship with his patients. Defendants' acts and/or omissions were done to enhance Defendants, and each of them, in various ways, including attempts to gain professional stature and a desire to reap monetary benefits.

93.     Defendants' conduct proximately caused DR. TURCIOS personal humiliation and mental anguish, as well as an impairment of his reputation and standing in the community.

94.     The physical seizure and criminal prosecution of DR. TURCIOS committed by Defendants was unnecessary, unreasonable and willfully malicious.  Therefore, Defendants are liable in damages to DR. TURCIOS pursuant to 42 U.S.C. § 1983, including compensatory damages, actual damages, punitive damages, costs and attorney's fees.

**COUNT II**
**ALL DEFENDANTS**
**CIVIL CONSPIRACY**

95.     Plaintiff hereby incorporates and re-alleges Paragraphs one (1) through ninety-four (94) as though fully alleged in Count II.

96.     In March 2015, and at all relevant times, Defendants, and each of them, knowingly entered into a conspiracy amongst themselves (and other individuals) for the purpose of depriving directly or indirectly DR. TURCIOS of his protected property interest and professional reputation, with the intent to steal his customers, harm him economically, and benefit the Defendants and others.  Defendants' acts and/or omissions were done to enhance Defendants, and each of them, in various ways, including by gaining professional stature and reaping monetary benefits.

97.     Defendants conspired together to deprive DR. TURCIOS of equal protection of the laws as alleged herein based on racial and/or ethnic animosity toward DR. TURCIOS as a person of Latino-American heritage.

98.     In furtherance of that conspiracy, Defendants, and each of them, engaged in oral, written, and electronic communications amongst themselves (and other individuals) to discuss how to deprive DR. TURCIOS of his constitutionally-protected property interests and professional reputation.  Defendants conspired amongst themselves with the intent to steal DR. TURCIOS' customers, harm him economically, and to enhance Defendants, and each of them, in various ways, including gaining professional stature and reaping monetary benefits.

99.     In furtherance of that conspiracy, the Defendants, and each of them, fabricated allegations against DR. TURCIOS, withheld and concealed evidence that tended to exculpate DR. TURCIOS and enlisted others to assist in building a criminal case against him based on false information willfully propagated by Defendants, and each of them.

100.    In committing the malicious prosecution described above, Defendants conspired, acting together in pursuance of a mutual understanding or agreement, and in pursuance of a common design and purpose to do unlawful acts.

101.    The goal of the overt acts and omissions described above was to accomplish an unlawful and/or oppressive purpose by unlawful, oppressive and/or immoral means, for their own personal benefit.

102.    By reason of the civil conspiracy committed by Defendants, DR. TURCIOS has suffered and continues to suffer injury to his professional reputation and significant economic losses.    Further, DR. TURCIOS has incurred pecuniary damages and mental anguish. Defendants' conduct proximately caused a deprivation of the rights, privileges and immunities secured to DR. TURCIOS by the United States Constitution and laws enacted thereunder.

103.    With this conduct, Defendants, and each of them, showed a reckless or callous indifference to the federally-protected rights of DR. TURCIOS.  Therefore, Defendants, and each of them, are liable in damages to DR. TURCIOS pursuant to 42 U.S.C. § 1983, including compensatory damages, actual damages, punitive damages, costs and attorney's fees.

**COUNT III**
**ALL DEFENDANTS**
**VIOLATION OF SUBSTANTIVE DUE PROCESS**

104.    Plaintiff hereby incorporates and re-alleges Paragraphs one (1) through one-hundred and three (103) as though fully alleged in Count III.

105.    The Fourteenth Amendment of the United States Constitution prohibits a state from depriving a citizen of liberty or property without due process of law.

106.    A dental license confers upon its holder a property interest that is entitled to due process protection.

107.    In March 2015, and at all relevant times, DR. TURCIOS' dental license conferred upon him a property interest that is entitled to substantive due process protection.

108.    In March 2015, and at all relevant times, DR. TURCIOS possessed a constitutionally-protected liberty interest in his personal reputation and his good name as it relates to his profession of dentistry in the Little Rock community.

109.    The suspension of DR. TURCIOS' dental license and the restrictions placed upon his ability to practice dentistry were proximately caused by Defendants' conduct described herein.

110.    Defendants had no legitimate basis for depriving DR. TURCIOS of his liberty or constitutionally-protected property interests.

111.    Defendants' conduct was outrageous and shocks the conscience, thereby violating DR. TURCIOS' substantive due process rights.

112.    The deprivation of DR. TURCIOS' liberty and constitutionally-protected property interests committed by Defendants was unnecessary, unreasonable and willfully malicious. Therefore, Defendants are liable in damages to DR. TURCIOS pursuant to 42 U.S.C. § 1983, including compensatory damages, actual damages, punitive damages, costs and attorney's fees.

WHEREFORE, Plaintiff, JOSE TURCIOS, D.D.S., by and through his attorneys, LAUX LAW GROUP, requests judgment against the defendants and each of them:

1.    That Defendants be required to pay Plaintiff's compensatory damages;

2.    That Defendants be required to pay economic and non-economic damages, including but not limited to loss of life, loss of liberty interest and mental anguish;

3.    That Defendants be required to pay punitive damages;

4.    That Defendants be required to pay reasonable attorney fees per 42 U.S.C. § 1988; and

5.    That Plaintiff receive any other such relief as this Honorable Court deems just and proper.

Respectfully submitted,


/s/       Michael J. Laux
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
LAUX LAW GROUP
One of the Attorneys for Plaintiff
400 W. Capitol Ave., Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 376-3482
E-mail: mlaux@lauxlawgroup.com
           mikelaux@icloud.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 14, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/EMF system, which shall send notification of such filing to the following:

Currently no attorneys of record.

/s/       Michael J. Laux         
Michael J. Laux
E. Dist. Arkansas Bar No. 6278834
LAUX LAW GROUP
One of the Attorneys for Plaintiff
400 W. Capitol Ave., Suite 1700
Little Rock, AR 72201
Telephone: (501) 242-0750
Facsimile: (501) 376-3482
E-mail: mlaux@lauxlawgroup.com
         mikelaux@icloud.com